2003 WY 157

**David H. STONHAM, Appellant (Plaintiff),**

v.

**Erni WIDIASTUTI, a/k/a Sara Stonham, Appellee (Defendant).**

No. 02–246.

Supreme Court of Wyoming.

Dec. 4, 2003.

Representing Appellant: Bert T. Ahlstrom, Jr., Cheyenne, Wyoming.

Representing Appellee: Mary Elizabeth Galvan, Laramie, Wyoming; and Donald J. Keenan, Riverton, Wyoming.

Guardian ad Litem: Carol Serelson, Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] David H. Stonham (Father) appeals the district court's decision awarding Erni Widiastuti, a/k/a Sara Stonham (Mother),[1] an Indonesian woman, sole custody of their two children, ordering that visitation occur in the community where the children reside, and requiring that Father post a $50,000.00 bond as a condition to exercising visitation. Father claims that the district court's decision was an abuse of discretion and/or arbitrary and capricious. We affirm.

## ISSUES

[¶ 2] The issues raised in this appeal are as follows:

1. Did the district court abuse its discretion when it awarded sole custody to Mother, who intended to take the children and return to Indonesia?

2. Did the district court abuse its discretion when it required that Father's visitation occur in the community where the children reside until the younger child reaches the age of ten?

3. Did the district court abuse its discretion by requiring, as a condition to exercising visitation, that Father post a $50,000.00 bond

as security against attorney's fees Mother may incur in enforcing her custody rights?

4. Is Mother entitled to sanctions against Father?

## FACTS

[¶ 3] Father, a citizen of the United States, and Mother, a native and citizen of Indonesia, became acquainted after Father responded to an advertisement Mother had placed in a dating magazine. After they corresponded for a number of months, Mother traveled to California and stayed with Father for about six months. She then returned to Indonesia, and approximately four months later, Father went to Indonesia where they were married. After a honeymoon in Bali, the couple returned to the United States. Mother was only able to secure a tourist visa, which visa expired after six months, thereafter rendering her an illegal alien.[2]

[¶ 4] After approximately ten months of marriage, Mother gave birth to their first child in California. In October 2000, they moved to Lander, where Father had taken a position with Fremont Motor Company. After eight months in Lander, Mother left the marital home with their son and went to a safehouse. Upon arriving home that evening, and finding Mother and son gone, Father telephoned local law enforcement and reported that his wife and child had been kidnapped. He also called the Indonesian Embassy and reported that his wife had kidnapped their son. Two days later, Father filed for divorce.

[¶ 5] A guardian ad litem for the children[3] was appointed and, on the parties'

---

1. Mother's name is spelled differently throughout the record. Therefore, we will refer to the spelling of her name as Erni Widiastuti.

2. At the time of trial, Mother was an illegal alien and subject to deportation. The parties dispute the reasons that Mother was not able to secure permanent residency. Father claims that he completed all the necessary paperwork and went to great lengths to secure residency for his wife, including contacting a local congressman. Mother, however, asserts that she was not able to gain residency because Father refused to sponsor her, told INS agents that she was a prostitute,

withheld information sent to her from the immigration office, and that she could not complete the necessary paperwork because of her limited knowledge of the English language.

3. Mother was pregnant when she left in June of 2001 and gave birth to a daughter on January 5, 2002. Although Father did not contest paternity at the divorce proceeding, he initially claimed that he did not know if the child was his, alleging that his own father may have impregnated his wife. However, the district court did not find Father's allegations credible, especially in light

stipulation, the district court ordered that Dr. Martha Schilling, Ph.D., conduct a custody evaluation. Dr. Schilling's report was completed in November of 2001. The next month, at a temporary custody hearing, Father's counsel attempted to present, for the district court's ratification, a "Custody & Separation Agreement," which had been prepared by Father and signed by Father and Mother. Pursuant to this agreement, the parties hoped to accomplish a "legal separation" with no time limit, and to establish the terms of that separation. However, the district court declined to ratify the proposed agreement. Although the parties represented that they were attempting to reconcile, the district court entered a temporary custody, support, and visitation order.

[¶ 6] The parties' attempted reconciliation was unsuccessful and a divorce trial was set for August 1 and 2, 2002. At trial, Father testified and called three lay witnesses to testify on his behalf. All three testified regarding their perceptions of the parties' relationship and respective parenting styles and abilities. Mother also testified, and called Malcolm Stonham (Father's father) and Maura Strong (Father's sister) as witnesses. Both stated that they thought Mother should be awarded custody. Malcolm Stonham reasoned that although he did not think that Father would intentionally harm the children, he worried that he was not "in control," that he might "snap," or "that something might happen." Maura Strong explained how Father had asked her to testify falsely on his behalf, that she felt he was capable of hurting the children, and that he had made threats to members of their family.

[¶ 7] Both parties also relied on the opinions of experts. Father called Mark Russler, a licensed counselor with a master's degree in social work. Mr. Russler had met with Father approximately sixteen times, and Mother ten times, over an eleven-month period. Father's one-hour sessions focused

mainly on helping him cope with the difficult life changes he was confronting. Mr. Russler testified that, in his opinion, Mother's desire to return to Indonesia was "completely selfish." Nonetheless, he concluded that both Father and Mother were capable and caring parents, and recommended a custody arrangement where both parents would have "frequent, regular contact [with the children] in their environment here." [4]

[¶ 8] Although she was not called as a witness, Dr. Schilling's custody evaluation was offered and received into evidence without objection.[5] Dr. Schilling has a Ph.D. in psychology and is a Wyoming licensed psychologist. In preparing her custody evaluation, Dr. Schilling met with Mother for seven and one-half hours and Father for ten hours, during which time she performed a clinical interview and administered a series of tests. Dr. Schilling also made a number of collateral contacts and reviewed relevant documents. She made very specific clinical findings with respect to both parents, and her report will be examined in more detail later in this opinion; however, with respect to custody and visitation, she concluded:

> It is my opinion, at this time, the mother is better equipped to make reasonable decisions about the child's welfare, provide a stable nurturing home environment, and presents no risk of verbal or emotional abuse to the child, and should therefore have primary custody. I recommend liberal visitation with the father.

[¶ 9] The district court took the matter under advisement, and approximately one month later issued a Judgment and Decree granting the divorce and awarding Mother primary custody and control of the two children. The district court stated that in reaching this conclusion, it had considered the applicable custody factors set forth in Wyo. Stat. Ann. § 20–2–201 (LexisNexis 2001), and made the following findings: Mother has been the primary caretaker of the children;

---

of the fact that his father had had a vasectomy many years prior.

4. Although Mr. Russler did not specify what he meant by "here," his prior testimony would indicate that "here" meant in the United States, and probably in Lander.

5. Father deposed Dr. Schilling and a transcript of the deposition was also admitted into evidence without objection.

Mother is better emotionally equipped to care for the children and to make reasonable decisions about the welfare of the children; Father's father and sister both testified that Mother would be a better parent; Father is unable to maintain stable, long-term relationships; Father's behavior indicated that he had little or no respect for Mother; and there was substantial evidence that Father was not truthful in his testimony or his responses to discovery. The district court granted Father two weeks of visitation in the fall, two weeks in the spring, and four weeks in the summer and ordered that the visitation be restricted to the community where the children reside until the younger child reaches her tenth birthday. Finally, the district court ordered that Father post a $50,000.00 bond as security against any attorney's fees that Mother may incur in enforcing her custody rights under the Decree of Divorce.

[¶ 10]   On September 6, 2002, Father filed a Notice of Appeal.

## STANDARD OF REVIEW

[¶ 11]   This Court has clearly articulated the standard for reviewing a district court's decision regarding custody and visitation:

"Custody, visitation, child support, and alimony are all committed to the sound discretion of the district court. It has been our consistent principle that in custody matters, the welfare and needs of the children are to be given paramount consideration. The determination of the best interests of the child is a question for the trier of fact. We do not overturn the decision of the trial court unless we are persuaded of an abuse of discretion or the presence of a violation of some legal principle.

A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. Our review entails evaluation of the sufficiency of the evidence to support the district court's decision, and we afford to the prevailing party every favorable inference while omitting any consideration of evidence presented by the unsuccessful party. Findings of fact not supported by

the evidence, contrary to the evidence, or against the great weight of the evidence cannot be sustained. Similarly, an abuse of discretion is present when a material factor deserving significant weight is ignored."

*In re MS,* 9 P.3d 984, 986 (Wyo.2000) (*quoting Reavis v. Reavis,* 955 P.2d 428, 431 (Wyo. 1998)). We have further stated that " '[j]udicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.' " *Cobb v. Cobb,* 2 P.3d 578, 579 (Wyo.2000) (*quoting Vaughn v. State,* 962 P.2d 149, 151 (Wyo. 1998) and *Byerly v. Madsen,* 41 Wash.App. 495, 704 P.2d 1236, 1238 (1985)).

## DISCUSSION

### The Children's Best Interests

[¶ 12]   Father begins his argument by referencing a number of cases regarding the "best interests of the child" standard and citing Wyo. Stat. Ann. § 20–2–201(a), which states the factors a district court shall consider in determining the best interests of the child. He then summarily concludes that had the district court fully considered all of the relevant factors in this case, the district court would have recognized that the interests of the children would best be served if they were under his primary care, custody and control. He claims that ruling otherwise was a clear abuse of discretion.

[¶ 13]   Without question, the primary consideration in custody matters must be the welfare of the children involved. In *Pace v. Pace,* 2001 WY 43, ¶ 11, 22 P.3d 861, 865 (Wyo.2001), we stated:

"The law affords wide discretion to the district court when fashioning custody and visitation provisions for the best interests of the children." *Reavis,* 955 P.2d at 431. We recognize such discretion encompasses one of the most difficult and demanding tasks assigned to a trial judge. *Id.* Ultimately, the "goal to be achieved is a reasonable balance of the rights and affections of each of the parents, with paramount

consideration being given to the welfare and needs of the children." *Leitner v. Lonabaugh*, 402 P.2d 713, 720 (Wyo.1965); *see also Dowdy v. Dowdy*, 864 P.2d 439, 440 (Wyo.1993).

[¶ 14] In determining what is in the child's best interest, Wyo. Stat. Ann. § 20–2–201 requires the district court to consider nine enumerated factors and any other factor it deems relevant.[6] Each case requires the trial court carefully to weigh the relevant factors while looking to the unique and individual family relationships in reaching a resolution that is in the best interests of the children in that family. *Reavis*, 955 P.2d at 431.

[¶ 15] Father asserts that the district court did not adequately address these factors. In *Produit v. Produit*, 2001 WY 123, ¶ 12, 35 P.3d 1240, 1243–44 (Wyo.2001) (footnote omitted), we articulated the role that this statute should play in a district court's custody determination:

Although explicit findings are not generally compelled, we note that Wyo. Stat. Ann. § 20–2–201(a) (LexisNexis 2001) became effective July 1, 2000, and sets out the factors the court shall consider in the proper disposition of children in a divorce. 2000 Wyo. Sess. Laws ch. 34, §§ 1, 8. This statute, although not specifically requiring findings as to the various factors, does direct the factors the court shall consider in ordering the disposition of children. On appeal, this court can ascertain whether the factors have been appropriately weighed only if the district court's consideration is reflected in the proceeding transcripts, by opinion letter, or as findings in the written order.

[¶ 16] We have consistently encouraged district courts to spell out the reasons for their conclusions so that we may evaluate the soundness of those reasons; however, they are not required to do so. *Resor v. Resor*, 987 P.2d 146, 148 (Wyo.1999); *Reavis*, 955 P.2d at 431–32. The Wyoming Rules of Civil Procedure require only that the district court issue findings of fact where "one of the parties requests it before the introduction of any evidence, with the view of excepting to the decision of the court upon the questions of law involved in the trial . . . ." W.R.C.P. 52(a). Consequently, the general rule is that absent a request pursuant to W.R.C.P. 52(a), no specific findings by the district court are required.[7] *Produit*, 2001 WY 123, ¶ 10, 35 P.3d at 1243. Nevertheless, although the district court is not required to make specific findings with regard to each factor listed in

---

6. Wyo. Stat. Ann. § 20–2–201(a) provides:

(a) In granting a divorce, separation or annulment of a marriage or upon the establishment of paternity pursuant to W.S. 14–2–101 through 14–2–120, the court may make by decree or order any disposition of the children that appears most expedient and in the best interests of the children. In determining the best interests of the child, the court shall consider, but is not limited to, the following factors:

(i) The quality of the relationship each child has with each parent;

(ii) The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;

(iii) The relative competency and fitness of each parent;

(iv) Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;

(v) How the parents and each child can best maintain and strengthen a relationship with each other;

(vi) How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;

(vii) The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy;

(viii) Geographic distance between the parents' residences;

(ix) The current physical and mental ability of each parent to care for each child;

(x) Any other factors the court deems necessary and relevant.

7. One notable exception to this general rule applies where a district court awards split custody. In that circumstance, the district court "must provide an explanation of its reasoning and place its findings on the record. A reasoned explanation and an expression of findings of a trial court's conclusion will assure this court that a comprehensive evaluation of all relevant factors occurred prior to the award of custody." *Pace*, 2001 WY 43, ¶ 17, 22 P.3d at 867.

Wyo. Stat. Ann. § 20–2–201, "[r]emand may be necessary if the consideration of [the] factors is not patent in the district court record." *Fergusson v. Fergusson*, 2002 WY 66, ¶ 16, 45 P.3d 641, 646 (Wyo.2002).

[¶ 17] In the present case, the district court, being fully aware that Mother was an Indonesian resident and planned to return to that country with the children, was confronted with an especially difficult and demanding custody and visitation decision.[8] The district court's decision was based on evidence indicating that Mother had been the children's primary caretaker; that she was emotionally better equipped to care for the children; and that she had the support of a stable, supportive and loving family in Indonesia. The district court also found, and the record indicates, that Father was unable to maintain stable, long-term relationships; that his attitude reflected that he had little or no respect for Mother; and that there was substantial evidence that Father was not truthful in his testimony or response to discovery.

[¶ 18] The district court's custody determination also was consistent with Dr. Schilling's custody evaluation. Dr. Schillings' relevant clinical findings were as follows:

> [Mother] is quite outgoing and sociable and likes to be around others. She is nurturing and protective and feels especially good about herself when she has been helpful or has given attention to the needs of others. She is skillful in building strong attachments between people, especially family and friends. She tends to have a

positive self-image and is optimistic about the future.

> [Mother] is logical and practical. She is willing to take risks and shows initiative and spontaneity. She is energetic and task oriented. [Mother] has an easy going and self-confident personal style. She seeks approval by acting in a charming manner. She knows when and how to be affable and accommodating. She knows intuitively how to make others feel special and interesting.

> [Mother] has an estimated IQ around the 70th percentile.

> . . .

> [Father] is strongly motivated to achieve his goals. His ambition drives him to be not only successful, but also to be among the best in his field. He is prepared to work hard for long periods to obtain what he believes he deserves. He is generally optimistic about his chances of success. [Father] is organized and meticulous, inefficiency or laziness may cause him to be overbearing. He is quite comfortable with himself.

> [Father] takes charge of his life making things happen rather than waiting for them to occur. He controls and modifies his environment and relationships, arranging events to suit his needs and desires. He takes the initiative and intervenes in the affairs of others. He is not overly concerned about pleasing others, and can be inattentive and insensitive to their feelings and wishes. [Father] prefers to do things his own way and usually makes his

---

8. We acknowledge that the international element of this case complicates the matter and magnifies the effect of the divorce on the parties and the children. Although we have not had prior occasion to address a case such as this, where one parent plans to relocate with the children to a foreign country, other courts have. *See* Caroll J. Miller, Annotation, *Court–Authorized Permanent or Temporary Removal of Child by Parent to Foreign Country*, 30 A.L.R.4th 548 (1984 & 2002 Supp.) and M. David LeBrun, Annotation, *Propriety of Awarding Custody of Child to Parent Residing or Intending to Reside in Foreign Country*, 20 A.L.R.4th 677 (1983 & 2002 Supp.).

The compiled cases illustrate the competing benefits and limitations in awarding or denying custody to a foreign parent. Many of the potential issues in the case before us have been ad-

dressed by other courts, including: effect of international custody arrangements on the non-custodial parent's visitation rights; the general cultural and sociological considerations as affecting the propriety of such an award; living conditions, ideals and cultural opportunities of the foreign country as they affect the child's best interest; and the impact and significance of different educational opportunities in foreign countries. Despite the factual differences in these cases, there is one common analytical thread in virtually every case: the best interest of the child is paramount in any award of custody and visitation, and the trial court has a large measure of discretion in making that award. Whether one parent is moving with the children across town or across the world, the analysis remains the same.

decisions with little formal advice from others. He may fail to listen to views contrary to his own. He is self-assured and confident of the correctness of his opinions.

[Father] demands that others conform to his rules and principles. He prefers to be surrounded with compliant people. He can be arrogant, for example, he provided numerous written instructions to [Mother] on the proper care of [their child]. He prefaced copies of his instructions to the GAL with "... [Mother] doesn't understand basic childcare and needs to be reminded to take care of her own son."

[Father] lacks insight and projects blame onto others. He bitterly insisted that [Mother] will "kidnap" [their child] and defy any court order giving him custody, at the same time, he justified "snatching" [their child] if the court does not rule in his favor.

[Father] distorts and exaggerates risk, for example he said "... [Mother] would get extremely depressed ... suicide was always on my mind with her ... with those killings in Houston, the woman who murdered her five children, and Munchausen's disease (syndrome) ... I always keep my eyes peeled just in case ... we talked about it quite a bit with her doctor in CA." Dr. Cvar, [Mother's] ob/gyn in CA, said "... I didn't think [Mother] was depressed as much as sad and lonely, which was an appropriate mood given her situation ... I always felt that there was something not right, but she wouldn't say anything ... it was almost like he was keeping her a prisoner ... he kept her away from people ... he was domineering and hypervigiliant ... I had a hard time trying to talk to her alone ... he would hover by the door ... I'm not surprised she left him."

[Father] makes a good first impression, however, his relationships tend to be superficial. He has stormy family relationships. He ruminates over perceived injustices and has been unable to sustain any intimate/family relationships over time.

[Father] has an estimated full scale IQ around the 14th percentile. However, his verbal IQ is at the 75th percentile and his performance IQ is at the 4th percentile, a difference that is significant at the .05 level. The IQ test suggests that [Father] has some perceptual-organizational disturbances, particularly with reasoning and analytical thinking. His mother said that perceptual problems were identified when he was placed in special education as a child.

[¶ 19] Dr. Schilling also made a number of specific findings. Her report stated that joint custody would not be appropriate because of the parties' inability to communicate with each other, lack of sound problem-solving and decision-making skills, and the fact that they would not likely reside in the same community following the divorce; that Father presented a moderate risk of verbal and emotional abuse to the child; that although both parties are capable of being adequate parents, Father's parenting skills are limited by "his inability to show the child good coping skills, his lack of sensitivity to signals from the child, his impatience and lack of flexibility, his problems sustaining intimate family relationships, his risk of verbal and emotional abuse to the child, and the amount of time the child will be in the care of another when [Father] works;" and that Mother has been the primary caretaker of the child.

[¶ 20] In addition to Dr. Schilling's report, the district court relied on the evidence presented at trial by the guardian ad litem, which evidence was favorable to Mother.[9] Even Father's own family members testified that they felt he should not be awarded custody and that Mother was a better parent.

■ [¶ 21] We cannot agree with Father's contention that the district court did not adequately or accurately address the factors in Wyo. Stat. Ann § 20–2–201, or that its determination of custody was not in the children's best interests. Father did not request that the district court make findings of fact pursuant to W.R.C.P. 52(a), and without

---

**9.** In this appeal, the guardian ad litem joins in Mother's brief and contends that the district court's order should be affirmed in all respects.

making such a request, a party "will not be heard to complain of the absence of formal findings." *Resor,* 987 P.2d at 148. Also, although the district court did not make specific findings with respect to each factor listed in Wyo. Stat. Ann § 20–2–201, there is ample evidence in the record and in the district court's findings to support its determination that awarding Mother primary physical custody was in the children's best interest. Accordingly, we affirm the district court's award of custody and visitation as a "reasonable balance of the rights and affections of each of the parents, with paramount consideration being given to the welfare and needs of the children." *Leitner v. Lonabaugh,* 402 P.2d 713, 720 (Wyo.1965).

### THE EFFECT OF GEOGRAPHIC DISTANCE ON THE VISITATION RIGHTS OF THE NON-CUSTODIAL PARENT

■ [¶ 22] Father next argues that his right to associate with his children was violated by the district court's visitation order. He asserts that a move by the custodial parent should be a major factor considered under Wyo. Stat. Ann. § 20–2–201(a). He also cites *Love v. Love,* 851 P.2d 1283, 1288 (Wyo.1993), for the proposition that when assessing the reasonableness of a custody award and visitation arrangement, the district court should consider "whether reasonable visitation is possible for the remaining parent." Finally, he references a Colorado case that sets out four factors a court should consider when fashioning a custody and visitation arrangement where the custodial parent is going to move from the state with a child. *In re Marriage of Donovan,* 36 P.3d 207, 209 (Colo.App.2001).[10]

10. Father does not apply these factors to the particular facts of this case nor does he argue for adoption of them by this Court. Although we acknowledge that consideration of these factors may be worthwhile to a district court making a custody determination where a parent is leaving the jurisdiction, we do not adopt them. Nonetheless, they could potentially be considered as "other factors the court deems necessary and relevant" in determining the best interest of the child pursuant to Wyo. Stat. Ann. § 20–2–201(a)(x). The four factors are:

■ [¶ 23] We have held, and our statutes provide, that the district court must consider, and weigh accordingly, the effect of geographic distance on the visitation rights of the non-custodial parent. *See* Wyo. Stat. Ann. 20–2–201(a)(viii) and *Resor,* 987 P.2d at 151. This factor seems particularly relevant here, where the parties would be separated by thousands of miles.

■ [¶ 24] While Father argues that the district court did not properly weigh this factor, he directs us to no evidence, nor do we find any in the record, to support this assertion. To the contrary, the evidence indicates that the district court was well aware of the potential difficulties involved with the substantial geographic distance:

This case would be very simple but for the fact that [Mother] intends to go back home to Indonesia if she is given custody of the children. Both [Father] and [Mother] testified as to the living conditions in Indonesia. [Mother] described a stable, supportive and loving family in Indonesia. [Mother] has stayed in weekly contact with her family and her mother has visited upon, at least, two occasions. [Mother's] mother was in Lander staying with her daughter and [the children] at the time of the hearing. [Mother] desires to go back to college (she has attended two years of college in Indonesia studying English) and then work after the children reach school age. [Mother] described her family home in somewhat different terms than did [Father]. Such descriptions lead the Court to believe that [Mother] and her family live in a clean, safe and stable environment. Bearing in mind the state of economic and political turmoil in Indonesia, it is still the

1) whether there is a reasonable likelihood the proposed move will enhance the quality of life for the child and the custodial parent; 2) whether the court is able to fashion a reasonable visitation schedule for the noncustodial parent after the move and the extent of the noncustodial parent's involvement with the child at the old location; 3) whether there is a support system of family or friends, either at the new or old location; and 4) the educational opportunities for the child at the new and old locations.
*In re Marriage of Donovan,* 36 P.3d at 209.

Court's opinion that [Mother] is, and will be, the better parent to [the children].

[¶ 25] The establishment of visitation schedules has always been within the sound discretion of the district court. *Rowan v. Rowan*, 786 P.2d 886, 891 (Wyo.1990). When examining the exercise of discretion of a district court, we will evaluate the " 'reasonableness of the choice made by the trial court.' " *Fergusson*, 2002 WY 66, ¶ 9, 45 P.3d at 644 (*quoting Vaughn*, 962 P.2d at 151). Father was granted two weeks of visitation in the spring, two weeks in the fall, four weeks in the summer, and any other visitation that he may be able to exercise. Although Father's visitation may have been less than what he had hoped for, and more burdensome than he would like, we find it reasonable under the circumstances. *See Basolo v. Basolo*, 907 P.2d 348, 355 (Wyo. 1995) ("[t]he hardship of a visitation schedule on one parent will not, without more, be viewed as an abuse of discretion, particularly where the parties are separated by great geographical distances.") and *Rowan*, 786 P.2d at 890–91.

### VISITATION RESTRICTED TO COMMUNITY WHERE CHILDREN RESIDE

[¶ 26] Father also claims that the district court abused its discretion by restricting his visitation to the community where the children reside. This claim is mentioned only in the "Summary of the Argument" and "Conclusion" sections of Father's appellate brief and is completely devoid of cogent argument, factual support, or citation to pertinent legal authority. Consequently, we will summarily affirm the district court's decision regarding this issue. *VJL v. RED*, 2002 WY 25, ¶ 20, 39 P.3d 1110, 1114 (Wyo.2002) (*citing Stone v. Stone*, 7 P.3d 887, 891 (Wyo.2000) and *May v. May*, 945 P.2d 1189, 1191 (Wyo.1997)).

### $50,000.00 BOND REQUIREMENT

[¶ 27] Finally, Father argues that his right to visit his children effectively has been negated by the district court's requirement that he post a $50,000.00 bond as a condition to exercising visitation. He asserts that although in the past he has been well employed, he is now deeply in debt as a result of the divorce, and that he will not be in a position to post a bond every time he wants to see his children. He claims that to impose this monetary condition is "quite simply unfair, onerous, punitive, and not sustainable."

[¶ 28] A bond-posting requirement, used to ensure compliance with a decree in visitation and custody cases, is within the discretion of the district court and finds support in the law. *See Beard v. Beard*, 368 P.2d 953, 954 (Wyo.1962) (court had right to add to the order that a bond be furnished if children removed from the state); *Leitner*, 402 P.2d at 716 (order requiring mother to post bond to assure performance of her obligations under the decree was valid and enforceable); *Matter of Marriage of Miller*, 600 S.W.2d 386, 388 (Tex.Civ.App.1980) (court upheld order requiring that father post a $5,000.00 bond before taking the children for a two week annual visitation); and 27C C.J.S. *Divorce* § 634 at 207 (1986 & 2002 Cum. Supp.). Where there is evidence that the non-custodial parent may fail to return the child, a court does not abuse its discretion by requiring a bond as a condition to visitation. *See generally Grimditch v. Grimditch*, 71 Ariz. 237, 226 P.2d 142, 142 (1951) (court struck down bond where there was nothing in the record to indicate that the father would violate a judgment of the court) and *Bienvenu v. Bienvenu*, 380 So.2d 1164, 1166 (Fla.App.1980). A bond must not be penal, but rather remedial in nature, and must have some relationship to the expense that the other party may incur in enforcing the decree to which the bond relates. *See Metz v. Metz*, 108 So.2d 512, 514 (Fla.App.1959). Determination of the proper amount of a bond is within the discretion of the district court, and "the amount should neither be so large that the noncustodial parent is unable to provide the bond, nor so small that it will not ensure compliance with its limitations." *McCullough v. Hudspeth*, 120 R.I. 598, 389 A.2d 1242, 1245 n. 4 (1978).

[¶ 29] Here, the district court characterized the $50,000.00 bond as "security against any attorney's fees [Mother] may incur in enforcing her custody rights under the Decree of Divorce." The district court

evidently felt this was necessary given the fact that Father had told Dr. Schilling, during their interview, that if he was not awarded custody, he had a plan to kidnap the children. Father claimed that he had already made contact with individuals in Indonesia and that he would hire a "snatch team" to carry out his plan. He also asserted that "snatching [his children] would not be against the law ... Muslim law and Indonesian law give the children to the father." Additionally, Mother reports that he made similar threats to her just a week prior to trial.

[¶ 30] In light of these reported statements by Father and the contentious nature of this case, we hold that the bond requirement was a reasonable exercise of the district court's discretion. Although $50,000.00 is a considerable amount, we find no evidence that the bond is penal in nature and conclude that it bears a reasonable relationship to the expenses Mother would incur if she were compelled to enforce the Decree of Divorce from halfway around the world.

SANCTIONS

[¶ 31] Mother requests that we certify that there is no reasonable cause for this appeal and that we award sanctions against Father. We decline to do so because this case does not rise to the level of "those rare circumstances where an appeal lacks cogent argument, where there is an absence of pertinent authority to support the claims of error, and/or when there is a failure to adequately cite to the record." *Amen, Inc. v. Barnard,* 938 P.2d 855, 858 (Wyo.1997); *Phifer v. Phifer,* 845 P.2d 384, 387 (Wyo.1993). Although parts of Father's argument were lacking, we did not consider any position advanced that was not supported by cogent argument or citation to pertinent authority. *Basolo v. Gose,* 994 P.2d 968, 970 (Wyo.2000).

**CONCLUSION**

[¶ 32] The district court was confronted with the difficult task of fashioning a custody and visitation arrangement that would balance the welfare and needs of children with the rights and affections of parents who would be living on opposite sides of the globe. Although Father claims that the district court abused its discretion in making its determination, we do not agree. While the great distance separating Father and his children is unfortunate, and visiting them in Indonesia may prove difficult, this result is the inevitable product of an international divorce, not an abuse of the district court's discretion.

[¶ 33] Affirmed.