# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 137

OCTOBER TERM, A.D. 2021

December 14, 2021

ERIN E. INNES, n/k/a ERIN E. LEMMONS,

Appellant
(Defendant),

v.                                                              S-21-0124

KYLE E. INNES,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
*The Honorable John R. Perry, Judge*

*Representing Appellant:*
    M.J. Hall and Toni E. Hartzel of Lance & Hall LLP, Cheyenne, Wyoming.

*Representing Appellee:*
    Devon P. O'Connell and Jason A. Matzen of Pence & MacMillan LLC, Laramie, Wyoming.

*Before FOX, C.J., and DAVIS, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    Erin Innes n/k/a Erin Lemmons (Wife) appeals the district court's division of marital property between her and Kyle Innes (Husband) on granting him a divorce.  We affirm.

## *ISSUE*

[¶2]    We restate the issue:

> Did the district court abuse its discretion by dividing the marital property as it did?

## *FACTS*

[¶3]    Husband and Wife married in January 2011 and separated approximately seven and a half years later, on or about July 18, 2018, when Husband filed for divorce.  They had no children.

[¶4]    During their marriage, Husband and Wife primarily lived in Gillette, Wyoming, where they both worked as veterinarians.  Husband entered the marriage with more assets than Wife,[1] had some education in finance, and thus managed the parties' finances.  He frequently moved money between joint and personal accounts, comingling his premarital assets with marital income.  He also inherited a substantial amount of money.  Whether to share his inheritance with Wife, how to title property purchased with it, and financial transparency became sources of conflict in the marriage.

[¶5]    The parties purchased two properties in Gillette between 2011 and 2015.  In 2011, they purchased a residential property (the marital residence).  Husband paid the down payment from his premarital assets.  Both their names were on the title and mortgage.  They paid the mortgage from their joint account until Husband closed that account in October 2017 and took over the payments.

[¶6]    In 2015, they purchased over 300 acres of rural property (the rural property).  Husband paid the down payment from his inheritance and premarital assets.  Both their names were on the title and mortgage.  Their long-term goal was to build a house, barn, and veterinary hospital on the property.  They invested time and money on improvements such as roads, fences, and a well.  Husband paid the mortgage from an account in his name.

---

[1] Husband had a house on 40 acres in Douglas, Wyoming; holdings in his family's businesses; money in IRAs; mutual funds; and a car.  Wife had $10,000 in a checking account, a car worth $7,500, and $90,000 in student loan debt.

[¶7]     The parties started two businesses in 2012.  They initially started Cowboy Country Animal Clinic, LLC (CCAC) so Husband could obtain discount medication for his family's ranch.  Then, around 2015, he stopped working as a veterinarian at a local clinic and began developing CCAC as a mobile clinic.  When Husband proposed removing Wife's name from CCAC's bank account for tax purposes, she objected and they signed an agreement to split CCAC's assets if they divorced.

[¶8]     They also started an endurance horse business in which they bought and then Wife trained, raced, and sold the horses with some success.  In 2012, they purchased three young horses and sold them for a profit in 2015.  Around 2014, they agreed that Wife should devote her veterinarian income to the business.  As Wife became more involved in the business, she began spending more time in Texas, where she could more easily train and race the horses during winter.  In 2020, they owned three horses and two trailers.

[¶9]     In Spring 2018, amid mounting tension over finances, Husband paid for them to attend a marriage retreat in Sedona, Arizona.  After the retreat, he suggested they start money management counseling but that never panned out.  Husband filed for divorce in July 2018.

[¶10]  The district court held a bench trial in December 2020, where Husband and Wife testified.  They mainly disagreed about the value of the horses.  Husband valued them high based on an October 2017 text message from Wife, but acknowledged she had expertise in the area that he did not.  Wife valued them lower because they were older and the market for endurance horses from the United States had evaporated since 2017.

[¶11]  In his written closing argument, Husband contended that it was "equitable and just that [he] be given consideration for his premarital funds, for the funds he inherited, and for the significant contributions made during the marriage when [Wife] was not contributing as an equitable partner."  He proposed a property division in which neither party owed the other any money.  In her written closing argument, Wife asked the court to award her "[t]he vehicles and personal property in her possession"; "[t]he assets still held by the horse business," including the three horses and two trailers; the IRAs in her name and $74,462.86 as an equalization of the investment accounts; "[t]he bank account and health savings account" in her name; and approximately $380,630 as her half of the equity in the two properties, CCAC's assets, and the amount in the parties' bank accounts.

[¶12]  Following the bench trial, the court issued a decision letter explaining its property disposition, which we discuss in more detail as relevant to our discussion.

[¶13]  In its corresponding *Judgment and Decree of Divorce*, the court divided the property as follows: Husband received the marital residence, the rural property, and any associated debt; a 2012 Dodge Ram; all interest in CCAC; his personal belongings and various paperwork; all IRAs in his name; and all bank accounts in his and his company's name.

2

Wife received a 2013 Dodge Ram; the horses and horse trailers; her personal belongings and paperwork; a blue bonnet painting; all IRAs in her name; and all bank accounts in her and her company's name. Then, to ensure "a just and equitable division of the marital assets[,]" the court ordered Husband to pay Wife $200,000. Wife timely appealed.

### DISCUSSION

[¶14]  Wife contends that the district court abused its discretion by "arbitrarily" awarding her $200,000. According to Wife, the marital estate the court considered in its property division consisted of only three assets—the marital residence, the rural property, and CCAC—because the court stated that it would not consider the parties' other assets in its equitable division. She maintains that the court should have awarded her $334,789.18 because it decided she was entitled to half of the equity in the marital residence, half of the equity in the rural property, and half of CCAC's assets. Wife asserts the court did not explain why it reduced that amount to $200,000, but posits it may have done so because it could not adduce the debt remaining on the marital residence and rural property on the date of separation. As a remedy, she requests we either modify the judgment to $334,789.18 or remand for further proceedings on the amount of debt owed on those properties on the date of separation.

[¶15]  Wyo. Stat. Ann. § 20-2-114(a) (LexisNexis 2021) governs disposition of property in a divorce.

> [I]n granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children.

"There are no specific guidelines as to the weight the district court must afford the statutory considerations when making a property division." *Malli v. Malli*, 2020 WY 42, ¶ 16, 460 P.3d 245, 249 (Wyo. 2020) (citing *Wallop v. Wallop*, 2004 WY 46, ¶ 26, 88 P.3d 1022, 1030 (Wyo. 2004); *Paul v. Paul*, 616 P.2d 707, 712 (Wyo. 1980)). The district court has discretion to decide what weight to give each factor. *Humphrey v. Humphrey*, 2007 WY 72, ¶ 13, 157 P.3d 451, 454 (Wyo. 2007) (citation omitted). Moreover, "[t]he statute does not require an equal division of property, and we have said 'a just and equitable division is as likely as not to be unequal.'" *Malli*, ¶ 16, 460 P.3d at 249 (quoting *McMurry v. McMurry*, 2010 WY 163, ¶ 8, 245 P.3d 316, 319 (Wyo. 2010)).

[¶16] We review the district court's property disposition for an abuse of discretion. "Judicial discretion is a composite of many things, among which are conclusions drawn

from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Id.* ¶ 14, 460 P.3d at 249 (quoting *Kamm v. Kamm*, 2016 WY 8, ¶ 3, 365 P.3d 779, 780–81 (Wyo. 2016)). Our analysis focuses on whether the district court could reasonably conclude as it did. *Id.* (citing *Porter v. Porter*, 2017 WY 77, ¶ 12, 397 P.3d 196, 198 (Wyo. 2017)). In our review, "we consider only the evidence in favor of the successful party, ignore the evidence of the unsuccessful party, and grant to the successful party every reasonable inference that can be drawn from the record." *Id.* (quoting *Porter*, ¶ 12, 397 P.3d at 198). A district court abuses its discretion when "the property disposition shocks the conscience of this court and appears to be so unfair and inequitable that reasonable people cannot abide it." *Id.* (quoting *Long v. Long*, 2018 WY 26, ¶ 22, 413 P.3d 117, 125 (Wyo. 2018)).

[¶17] Because we must "evaluate[] whether the district court's property division is equitable from the perspective of the overall distribution rather than from a narrow focus on the effects of any particular disposition," *Stevens v. Stevens*, 2014 WY 23, ¶ 11, 318 P.3d 802, 807 (Wyo. 2014) (citation omitted), we turn to the district court's decision letter, where it considered the statutory factors and explained its overall distribution.

[¶18] The district court began its analysis by noting that "the extensive comingling of [Husband's] premarital assets with the couple's marital finances and CCAC's finances [] left the court with the common scenario where it [had to] attempt to 'unscramble an egg[.]'" For example, Husband sometimes deposited his employment income into the parties' joint account and other times he deposited it into his separate accounts. In addition, Wife deposited her employment income into the joint account until 2013 or 2014, when they agreed to commit it to the endurance horse business. Husband moved $50,000 from the CCAC account to an investment account in his name alone approximately six months before filing for divorce. And Husband's testimony about his premarital accounts and the funds he moved in and out of joint accounts and CCAC's accounts was unclear.

[¶19] The court then considered the statutory factors and analyzed the property subject to division. As to the respective merits of the parties, the court found "neither party to be at greater fault in bringing about the demise of the marriage[,]" noting that the "marriage ended more as a result of the parties' conflicting life goals than greater 'fault' on the part of either [Husband] or [Wife]." As to the condition in which the divorce would leave the parties, the court found that both had "advanced degrees and likely similar earning potential." "No disability or other disadvantage was noted for either party[,]" and Wife's "student loans of approximately $90,000 were paid off during the marriage."

[¶20] As to the marital residence, the court stated:

> The down payment on the residence, over $76,000, came from [Husband's] premarital assets. The court finds the value of the residence on the date of separation was $345,000. No evidence

4

was adduced as to the amount of debt remaining on the residence as of [separation], although [Husband's] Exhibit 2 lists it as $251,249.29. The house was titled in the names of [Husband] and [Wife]. During the marriage, both parties contributed funds to the joint checking account from their employment income, and mortgage payments on the residence were made from that account.

It concluded Wife was "entitled to half of the equity in the marital residence as of the date of separation."

[¶21] As to the rural property, the court stated:

[Husband] testified he made the down payment (approximately $450,000) for this property out of his separate funds and that each mortgage payment came from an account held in his name alone. Both parties improved the property, adding a road and a water well, among other things. Some of the funds for improvements came from joint accounts, some from the parties' separate accounts. The court finds the date of separation value of this property to be $689,000, based upon the appraisal submitted. No evidence was adduced as to the amount of debt remaining on this property as of [separation], although [Husband's] Exhibit 2 lists it as $207,915.30.

. . . .

The court believed [Wife's] testimony that the parties had purchased this property with the long-term goal of building a home and raising children there and building a veterinary clinic there. The court also believed [Husband's] testimony that [Wife] indicated she would seek a divorce if he purchased the property with his separate funds and held it in his name only.

The court finds [Husband] paid approximately two-thirds of the cost of this property out of his separate funds, knowing it would be owned equally by the parties. [Husband] had prior experience with real estate transactions, additional education in finance, and was clearly the more sophisticated party in this area. Certainly, he was aware he had a choice in making the purchase. And, reprehensible as [Wife's] behavior might have been, [Husband] apparently determined the value of the

5

marriage was greater than his individual pecuniary cost at that point.

It concluded Wife was "entitled to half of the equity in [the rural property] as of the date of separation."

[¶22] Next, the court addressed CCAC, along with the endurance horses, retirement accounts, bank accounts, vehicles, horse trailers, painting, personal property, marriage counseling expense, and credit card debt. In sum, it found the following:

- CCAC. The parties entered into a valid post-nuptial agreement to divide CCAC's assets equally on divorce. CCAC's assets totaled $94,742.94 on the date of separation.

- Endurance horses. There was no evidence on the value of the endurance horses on the date of separation, and the court had little usable evidence about their value.

- Retirement accounts. Both Husband and Wife had IRA accounts through Vanguard and Invesco. Given the lack of evidence about the source of the funds in those accounts, the parties would retain their respective IRAs and the court would not consider them in the equitable division.

- Bank accounts. The court received insufficient evidence to quantify the parties' respective contributions to the joint account or their individual accounts. It considered their "personal bank accounts only generally in balancing the equities."

- Vehicles. Husband would retain the 2012 Dodge Ram and Wife would retain the 2013 Dodge Ram.

- Horse trailers. The two horse trailers Wife owned as part of the endurance horse business would be set over to her. She testified that one was worth $16,500 and the other was worth $5,000 more than the loan against it.

- Painting. The blue bonnet painting would be set over to Wife because Husband intended it as a gift.

- Personal property. The parties would retain the personal property in their possession.

- Marriage counseling. The court considered the expense Husband paid for marriage counseling in its equitable division.

- Credit card debt. The court did not consider the credit card debt listed in Husband's property and debt summary in its equitable division. Each party would be responsible for any credit card debt in his/her name.

[¶23] Finally, in its "Marital Estate Division—Conclusion", the court decided that, "[t]aking into consideration the factors set forth at W.S. § 20-2-114, . . . a just and equitable division of the marital assets will be accomplished by [Husband] paying to [Wife] $200,000."

[¶24] On reviewing the overall distribution, it is plain that the marital estate the court considered in its equitable division consisted of more than just the marital residence, the rural property, and CCAC. While the court did not consider the retirement accounts or credit card debt in its equitable division, it did consider that Wife's student loans were paid during the marriage; the endurance horses; the personal bank accounts; the vehicles and horse trailers; and the expense Husband paid for marriage counseling. Wife's argument does not account for these.

[¶25] It is equally plain that the court never intended $200,000 to represent the sum total of half the equity in the marital residence, half the equity in the rural property, and half of CCAC's assets on the date of separation. It intended $200,000 to be an equalization payment on considering the Wyo. Stat. Ann. § 21-2-114 factors in light of the evidence. Wife's argument mischaracterizes the $200,000 judgment and does not account for the district court's discretion to weigh the statutory factors.[2]

---

[2] Wife suggests the district court "lacked pertinent information regarding the debt owed on" the marital residence and rural property and did not "utiliz[e] *any* value" as to the remaining debt. Although the district court stated that no evidence was adduced as to the amount of debt remaining on the marital residence and rural property on the date of separation, it acknowledged Husband's exhibit outlining those debts, and the debt remaining on those properties was never in dispute. Each party submitted an exhibit listing the debt remaining on the residential property as $251,249.29 and the debt remaining on the rural property as $207,915.30, the same amounts the district court noted in determining its equitable division. Unlike the errors found in *Neuman* and *Kennedy*, on which Wife relies, on this record we cannot conclude that the district court failed to properly value the assets or substituted its own opinion as to the value of those assets. *Cf. Neuman v. Neuman*, 842 P.2d 575, 583 (Wyo. 1992); *Kennedy v. Kennedy*, 761 P.2d 995, 998 (Wyo. 1988).

[¶26]  The district court awarded property in a division it considered fair and equitable after applying the factors set forth in Wyo. Stat. Ann. § 20-2-114.  It did not abuse its discretion.

[¶27]  Affirmed.