# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 64

**APRIL TERM, A.D. 2023**

**June 22, 2023**

JARED EATON DUTKA,

Appellant
(Plaintiff),

v.

EMILY RENE-ELIZABETH DUTKA,

Appellee
(Defendant).

EMILY RENE-ELIZABETH DUTKA,

Appellant
(Defendant),

v.

JARED EATON DUTKA,

Appellee
(Plaintiff).

S-22-0256, S-22-0264

*Appeal from the District Court of Sheridan County*
The Honorable William J. Edelman, Judge

*Representing Jared Eaton Dutka:*
> Christopher M. Wages, The Wages Group, LLC, Buffalo, Wyoming.

*Representing Emily Rene-Elizabeth Dutka:*
> Jared S. Crecelius, Matthew Walker, Melinda Godwin, Olsen Legal Group, LLC, Cheyenne, Wyoming.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]   The district court granted Jared Eaton Dutka (Father) and Emily Rene-Elizabeth Dutka (Mother) a divorce, awarded Mother primary custody of their two children, and divided the marital property.  Father appeals from the custody decision (Appeal No. S-22-0256), and Mother appeals from the division of property (Appeal No. S-22-0264).  We affirm.

## ISSUES

[¶2]   Father raises two issues which we restate as follows:

1.  Did the district court abuse its discretion at trial when it allowed one of Mother's witnesses to provide expert opinion testimony and admitted the witness's report containing the opinions into evidence despite Mother's failure to designate the witness as an expert under Wyoming Rule of Civil Procedure (W.R.C.P.) 26(a)(2)(A)?

2.  Did the district court abuse its discretion by awarding Mother primary custody of the children?

[¶3]   Mother raises a single issue which we restate as follows:

Did the district court abuse its discretion in dividing the marital property?

## FACTS

[¶4]   Father and Mother married on July 24, 2017, less than two weeks after they met online.  At that time, Father was living in Sheridan, Wyoming, while on R&R (rest and recuperation) travel from his job as a Foreign Service Officer with the United States Department of State (State Department), and Mother was living in Fort Collins, Colorado, with ERED, her 18 month-old son from a previous relationship.  Following their marriage, the parties resided in a home in Sheridan and added Father to ERED's birth certificate even though Father never formally adopted ERED.  In Spring 2018, the parties moved to Austria for Father to begin his new assignment with the State Department.  That November, while still in Austria, Mother gave birth to the parties' daughter, CAD.

[¶5]   Six months later, in May 2019, Mother flew to Colorado and enlisted with the Colorado Army National Guard.  She returned to Austria and remained there until November 2019, when she again traveled to Colorado for military training.  While Mother was in Colorado, Father received a new assignment from the State Department which required him to move with the children to the U.S. Embassy in Serbia.  In November 2020, after a year in Colorado, Mother joined the family in Serbia.  In June 2021, Mother traveled

1

to Germany for military training and remained there until August 2021. Two months later, the parties separated and Mother moved to Colorado; Father remained in Serbia with the children.

[¶6]     Father filed a complaint for divorce and Mother counterclaimed for divorce. Both parties sought custody of the children and a just and equitable division of the marital property. Per the parties' stipulation, the district court awarded Mother temporary custody of the children while the divorce proceedings were pending. After a one-day bench trial, during which each party was given three hours to present his or her case, the district court entered a decree granting the parties a divorce, awarding Mother primary custody of the children, ordering Father to pay Mother $1,679 in monthly child support, and dividing the marital property. These appeals followed.

[¶7]     We will provide additional facts, as necessary, in the discussion of the issues.

## DISCUSSION

### A. Father's Appeal—No. S-22-0256

#### 1. Expert Testimony

[¶8]     The district court's case management order required the parties to designate expert witnesses by April 14, 2022. Neither party designated any expert witnesses; however, Mother listed Dr. Heather Calhoon as a "may call" witness in her pretrial memorandum and stated she "may testify regarding her evaluation of [Mother] on April 29, 2022." Mother had retained Dr. Calhoon, a clinical forensic psychologist, to determine whether she had any underlying mental health concerns which would impact her parenting capabilities. After interviewing Mother and administering various psychological and intellectual tests, Dr. Calhoon prepared a written report finding Mother did not meet the criteria for having a personality disorder under the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V), though she did exhibit histrionic and turbulent traits. Mother provided Father a copy of Dr. Calhoon's report prior to trial.

[¶9]     At trial, Mother's attorney called Dr. Calhoon as a witness and sought to introduce her report into evidence. Father objected because Mother had failed to properly and timely disclose Dr. Calhoon as an expert. Mother's attorney argued he was "not calling [Dr. Calhoon] as an expert"; rather, Dr. Calhoon was Mother's treating physician because she evaluated Mother and would testify to her "actual firsthand knowledge observations." The district court overruled Father's objection, finding Father was not prejudiced by Mother's failure to designate Dr. Calhoon as an expert because he received Dr. Calhoon's report in discovery and therefore "knew what her opinions were." Dr. Calhoon testified consistent with her report, which was admitted into evidence.

2

[¶10] Father argues the district court abused its discretion when it allowed Dr. Calhoon to offer opinion testimony at trial and admitted her report into evidence. He claims Mother retained Dr. Calhoon to provide an expert opinion regarding Mother's mental health and capacity to parent. As a result, he argues Mother was required under W.R.C.P. 26 to designate Dr. Calhoon as an expert witness by April 14, 2022, in accordance with the district court's case management order.

[¶11] Because Father properly objected, we review the district court's admission of Dr. Calhoon's testimony and report for an abuse of discretion. *Matter of GAC*, 2017 WY 65, ¶ 32, 396 P.3d 411, 419 (Wyo. 2017) (citing *CL v. ML*, 2015 WY 80, ¶ 15, 351 P.3d 272, 277 (Wyo. 2015)).

> "A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal. The appellant bears the burden of showing an abuse of discretion."

*Id.* (quoting *Wise v. Ludlow*, 2015 WY 43, ¶ 42, 346 P.3d 1, 12 (Wyo. 2015), and *Glenn v. Union Pac. R.R. Co.*, 2011 WY 126, ¶ 12, 262 P.3d 177, 182 (Wyo. 2011)) (other citation omitted). "A district court does not abuse its discretion if it could reasonably conclude as it did." *Hehn v. Johnson*, 2022 WY 71, ¶ 18, 511 P.3d 459, 462-63 (Wyo. 2022) (quoting *Sears v. Sears*, 2021 WY 20, ¶ 13, 479 P.3d 767, 772 (Wyo. 2021), and *Johnson v. Clifford*, 2018 WY 59, ¶ 8, 418 P.3d 819, 822 (Wyo. 2018)).

[¶12] Rule 26(a)(2)(A) requires a party to "disclose to the other parties the identity of any witness it may use at trial to present evidence under Wyoming Rule of Evidence [(W.R.E.)] 702, 703, or 705." "[I]f the witness is one retained or specially employed to provide expert testimony in the case," the disclosure must be accompanied by a written report containing a statement of all opinions to be expressed, the basis and reasons for the opinions, the data or information relied upon to form the opinions, any exhibits to be used by the expert, the expert's qualifications and past publications, the compensation to be paid to the witness, and a list of cases in which she has previously testified. Rule 26(a)(2)(B). In general, a party must make its expert disclosures "at the times and in the sequence that the court orders." Rule 26(a)(2)(D).

[¶13] Mother claims, as she did at trial, that she did not need to designate Dr. Calhoon as an expert under Rule 26(a)(2)(A) because Dr. Calhoon was a "fact expert." She refers to Dr. Calhoon as her "mental health provider[,]" i.e., a treating physician.

[¶14] Dr. Calhoon was retained by Mother to perform a mental health/parental capacity evaluation and to provide the results of that evaluation at trial. She did not treat Mother for a mental health or other condition and the mere fact she personally met with Mother

3

does not change that. *Cf. Vahai v. Gertsch*, 2020 WY 7, ¶ 33, 455 P.3d 1218, 1229 (Wyo. 2020) ("Mr. Gertsch retained Dr. Bernton to perform a medical examination of Ms. Vahai and to provide expert testimony at trial. Dr. Bernton did not treat her and was not a treating physician."). Dr. Calhoon's recommendations make clear she was not Mother's treating physician/mental health provider. Dr. Calhoon stated: "[Mother] had expressed interest in obtaining individual psychotherapy. Should she wish to do so, it is recommended that she engage in individual therapy with a consistent provider, preferably an integrated model of client-centered therapy, cognitive behavioral therapy (CBT), and dialect behavioral therapy (DBT)." Dr. Calhoon also encouraged Mother "to consult with a psychiatrist for a medication evaluation to determine if there is a need for psychotropic medications." If Dr. Calhoon was providing mental health treatment to Mother, there would have been no need for her to recommend that Mother seek such treatment from other sources. Even assuming she was Mother's treating physician, the content of Dr. Calhoon's testimony demonstrates she "sign[ed] on to provide opinions in this case" as to whether Mother had a mental health condition. *Tracy v. Tracy*, 2017 WY 17, ¶ 39, 388 P.3d 1257, 1266 (Wyo. 2017). *See also, In re Paternity of HLG*, 2016 WY 35, ¶ 16, 368 P.3d 902, 906 (Wyo. 2016) ("[I]t is the substance of the witness's opinion testimony that determines whether it is expert or lay in nature."); *Smith v. Paiz*, 2004 WY 14, ¶ 9, 84 P.3d 1272, 1275-76 (Wyo. 2004) ("Treating physicians may be fact witnesses, and if they offer an opinion, they may be expert witnesses also. Their status depends on the content of their testimony: If they only testify as to what they observed and did within the physician-patient relationship, then they would be fact witnesses; if, in addition to testifying to the facts, the treating physicians offered an opinion, then they would be expert witnesses.").

[¶15] In *HLG*, the mother listed her child's counselor/therapist, Cindy Parrish, as a "will call" witness in her pretrial disclosures and provided the father with the records of Ms. Parrish's counseling sessions with the child. *HLG*, ¶ 8, 368 P.3d 902 at 904-05. The mother did not, however, designate Ms. Parrish as an expert witness or provide the father with a report or summary of Ms. Parrish's opinions. *Id.* At trial, the mother's attorney questioned Ms. Parrish about her education and specialization in child counseling and asked about her counseling sessions with the child, including one session in which she had the child draw the parents' houses. *Id.*, ¶¶ 9, 11, 19, 368 P.3d at 905-06. Ms. Parrish testified she was a licensed counselor who specialized in children's therapy and described the colors the child used to draw the houses and the child's comments about wanting to stay at the mother's house "forever" and to not see the father. *Id.*, ¶¶ 9, 11, 368 P.3d at 905. The mother's attorney then asked Ms. Parrish, "'What do you make of this sort of drawing with a six-year-old, when he's expressing these things to you?'" *Id.*, ¶ 11, 368 P.3d at 905. The father objected because the question called for an undisclosed expert opinion. *Id.* The district court sustained the father's objection and we affirmed. *Id.*, ¶ 13, 368 P.3d at 905. We rejected the mother's argument that Ms. Parrish was offering a lay opinion under W.R.E. 701. *Id.*, ¶ 19, 368 P.3d at 906-07. We determined Ms. Parrish's recitation of her qualifications indicated her opinion would be expert in nature and the attorney's question regarding what Ms. Parrish would "make of" the child's drawing

4

"clearly asked for an opinion based upon [her] technical knowledge and training in the field of child therapy." *Id.* "A person without specialized training or knowledge generally would not know the meaning or implications of a child's drawing made during a counseling session." *Id.*, ¶ 19, 368 P.3d at 907. *See also,* Rule 702 (describing an expert as one who has "scientific, technical, or other specialized knowledge [which] will help the trier of fact to understand the evidence or to determine a fact in issue"); *Tucker v. State*, 2010 WY 162, ¶ 21, 245 P.3d 301, 307 (Wyo. 2010) ("If a witness's testimony draws on experience beyond the ken of the average person, that witness must meet the qualification requirements of Rule 702.").

[¶16] Similarly, Mother's attorney asked Dr. Calhoon to describe her educational background and professional work experience. Dr. Calhoon responded she had masters and doctorate degrees in clinical forensic psychology and the majority of her professional work was performing forensic psychological evaluations. After having Dr. Calhoon describe her evaluation of Mother, counsel asked Dr. Calhoon for her "overall impressions of [Mother]." Dr. Calhoon responded, "[Mother] did not have any clinical diagnoses based off of the DSM[-]V, which is what [psychologists] use to determine any type of psychological diagnosis." The questions and answers concerning her education and specialization in performing psychological evaluations demonstrate Dr. Calhoon was providing an expert opinion that Mother did not have a mental health condition under the DSM-V. An individual without knowledge of or specialization in forensic clinical psychology would not know whether Mother met the criteria for a mental health diagnosis under the DSM-V. Mother should have designated Dr. Calhoon as an expert witness under Rule 26(a)(2)(A) by the deadline provided in the court's case management order.

[¶17] W.R.C.P. 37(c)(1) provides:

> If a party fails to . . . identify a witness as required by Rule 26(a) . . ., the party is not allowed to use that . . . witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions . . . .

*See also, Downs v. Homax Oil Sales, Inc.*, 2018 WY 71, ¶ 27, 421 P.3d 518, 525 (Wyo. 2018) ("[A] party who fails to comply with its Rule 26 discovery obligations generally is not permitted to use the undisclosed evidence at trial unless the failure was substantially justified or harmless. . . . Additionally, a court may, in its discretion, choose to impose alternative sanctions." (citations omitted)); *HLG*, ¶ 25, 368 P.3d at 908 ("Rule 37(c)(1)

provides for automatic exclusion of undisclosed evidence unless there is substantial justification for the failure to disclose, the failure is harmless, or the district court determines another sanction is appropriate." (citing *Dishman v. First Interstate Bank*, 2015 WY 154, ¶¶ 28-29, 362 P.3d 360, 369-70 (Wyo. 2015))). "The party seeking to avoid exclusion has the burden of establishing its failure to comply with the discovery obligations was harmless." *HLG*, ¶ 25, 368 P.3d at 908 (citing *Black Diamond Energy, Inc. v. Encana Oil & Gas (USA) Inc.*, 2014 WY 64, ¶ 45, 326 P.3d 904, 916 (Wyo. 2014)).

[¶18] In *Winterholler v. Zolessi*, 989 P.2d 621, 628 (Wyo. 1999), we adopted the following factors as relevant in determining whether a party's violation of its discovery responsibilities was harmless:

> "(1) whether allowing the evidence would incurably surprise or prejudice the opposing party;
>
> (2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;
>
> (3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully;
>
> (4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and
>
> (5) the impact of excluding the proposed testimony on the completeness of the information before the court or jury."

(quoting *Dada v. Children's Nat'l Med. Ctr.*, 715 A.2d 904, 909 (D.C. 1998)) (other citations omitted). *See also*, *Downs*, ¶ 28, 421 P.3d at 525.

[¶19] Father maintains the district court abused its discretion by admitting Dr. Calhoon's expert opinion testimony and report without first requiring Mother to satisfy her burden of showing her failure to designate Dr. Calhoon as an expert was harmless or reviewing the *Winterholler* factors. He also argues the court abused its discretion by determining he was not prejudiced by Mother's failure to designate Dr. Calhoon as an expert because he had received Dr. Calhoon's report. According to Father, he was "greatly prejudiced" by Mother's failure to designate because he was unable to retain a counter expert and although he had Dr. Calhoon's report, it did not contain all the information required by Rule 26(a)(2)(B), including her curriculum vitae and a list of cases in which she had previously testified. Father also claims that because he had no pre-trial opportunity to depose Dr. Calhoon, he had to use his allotted three hours at trial to cross-examine Dr. Calhoon regarding her opinions and testing methods and therefore ran out of time cross-examining Mother and was unable to cross-examine Mother's final witness or present any rebuttal

6

evidence. Finally, Father claims he was prejudiced by the admission of Dr. Calhoon's opinions and report because the court relied on them to award Mother custody of the children.

[¶20] Despite knowing prior to trial that Mother may call Dr. Calhoon as a witness and having her report which indicated she would provide expert opinion testimony, Father did not file a pretrial motion to strike Dr. Calhoon as a witness or to exclude her report. By failing to do so, Father deprived the district court of the "opportunity to apply the harmlessness test outside the trial setting" and cannot now complain the court abused its discretion by admitting Dr. Calhoon's testimony and report without first requiring Mother to show her failure to designate Dr. Calhoon as an expert was harmless or by failing to review the *Winterholler* factors. *HGL*, ¶ 29, 368 P.3d at 909. Father also did not request more time to present his case or make an offer of proof describing the cross-examination or rebuttal evidence he would have presented if he had not had to use his allotted trial time cross-examining Dr. Calhoon. *See Lemus v. Martinez*, 2019 WY 52, ¶¶ 37-40, 441 P.3d 831, 840 (Wyo. 2019).

[¶21] The district court expressly considered only the first *Winterholler* factor and concluded Father would not be prejudiced by the admission of Dr. Calhoon's testimony and report because he had received the report prior to trial and therefore knew her opinions. We cannot say such conclusion was unreasonable. Mother listed Dr. Calhoon as a "may call" witness in her pretrial memorandum and stated Dr. Calhoon may testify regarding her evaluation of Mother. Mother provided Father with Dr. Calhoon's report prior to trial, and the report contained Dr. Calhoon's opinion that Mother did not suffer from a mental health disorder affecting her ability to parent. Because Father knew Dr. Calhoon was a potential witness and the nature of her opinions, he cannot claim he was "'incurably surprise[d] or prejudice[d]'" when Mother sought to introduce her testimony and report at trial. *Winterholler*, 989 P.2d at 628 (quoting *Dada*, 715 A.2d at 909). Since Mother's failure to designate Dr. Calhoon as an expert witness was harmless, the district court did not abuse its discretion at trial by allowing Dr. Calhoon to provide expert opinion testimony and by admitting her report into evidence.[1]

[¶22] Even if the court abused its discretion by admitting Dr. Calhoon's opinion testimony and report, the error would not be reversible because there is no "reasonable probability that, in the absence of the error, the verdict might have been different." *Vahai*, ¶ 38, 455 P.3d at 1230 (quoting *Smyth v. Kaufman*, 2003 WY 52, ¶ 29, 67 P.3d 1161, 1170 (Wyo. 2003), and citing *TZ Land & Cattle Co. v. Condict*, 795 P.2d 1204, 1210 (Wyo. 1990)) (other citation omitted). In the divorce decree, the district court discussed "[t]he current physical and mental ability of each parent to care for each child" under Wyo. Stat. Ann. § 20-2-201(a)(ix) (LexisNexis 2021). It found that although Father had suggested at trial

---

[1] While Father faults the district court for not analyzing all of the *Winterholler* factors, he only analyzes the first factor in his brief. As a result, we confine our analysis to the first factor.

that "Mother may have mental health concerns," that suggestion "was refuted by Mother and the mental health provider called to testify at trial." However, the court also found: "*[E]ven if the mental health diagnoses were true*, the [c]ourt does not believe that issue to be dispositive of [Mother's] ability to care for her children. She has demonstrated a willingness to cooperate with providers if need be and plenty of parents have raised children while also dealing with mental health concerns." (Emphasis added). It is clear the district court would have found Mother mentally able to care for the children even in the absence of Dr. Calhoon's testimony and report and therefore there is no reasonable probability that their admission affected the court's decision to award Mother primary custody of the children.

[¶23] Mother was required to designate Dr. Calhoon as an expert witness under Rule 26(a)(2)(A). However, because her failure to do so was harmless, the district court did not abuse its discretion at trial by admitting Dr. Calhoon's opinion testimony and report.

### 2. Custody

[¶24] We review the district court's custody decision for an abuse of discretion. *Hehn*, ¶ 18, 511 P.3d at 462 (citing *Sears*, ¶ 13, 479 P.3d at 772, and *Johnson v. Johnson*, 2020 WY 18, ¶ 10, 458 P.3d 27, 32 (Wyo. 2020)). As stated above, "'[a] district court does not abuse its discretion if it could reasonably conclude as it did.'" *Id.*, ¶ 18, 511 P.3d at 462-63 (quoting *Sears*, ¶ 13, 479 P.3d at 772, and *Johnson*, ¶ 8, 418 P.3d at 822).

[¶25] In awarding custody and visitation, the children's best interests are "'paramount.'" *Johnson*, ¶ 12, 458 P.3d at 32 (quoting *Arnott v. Arnott*, 2012 WY 167, ¶ 31, 293 P.3d 440, 455 (Wyo. 2012), and *Stonham v. Widiastuti*, 2003 WY 157, ¶ 17 n.8, 79 P.3d 1188, 1194 n.8 (Wyo. 2003)). To determine the children's best interests, a district court must consider the following list of non-exclusive factors:

> (i) The quality of the relationship each child has with each parent;
> (ii) The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;
> (iii) The relative competency and fitness of each parent;
> (iv) Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;
> (v) How the parents and each child can best maintain and strengthen a relationship with each other;

8

(vi) How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;

(vii) The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy;

(viii) Geographic distance between the parents' residences;

(ix) The current physical and mental ability of each parent to care for each child;

(x) Any other factors the court deems necessary and relevant.

Section 20-2-201(a). "'No single factor is determinative,' and 'depending on the case, different factors will present a greater need for emphasis. The one constant is that the resolution must be in the [children's] best interests[.]'" *Johnson*, ¶ 12, 458 P.3d at 33 (quoting *Stevens v. Stevens*, 2014 WY 23, ¶ 26, 318 P.3d 802, 811 (Wyo. 2014)).

[¶26] After considering each of the above statutory factors, the district court determined it would be in ERED's and CAD's best interests for Mother to have primary custody. It found both parties have an overall good relationship with the children, are competent and fit to parent, are capable of maintaining and continuing to build relationships with the children, communicate well with the children, have not prevented the other parent from exercising his or her parental rights and responsibilities, and are physically and mentally able to provide care for the children. Section 20-2-201(a)(i), (iii), (v), (vi), (vii), (ix). The court also noted "the children seem happy, healthy, and well-adjusted to their current home [with Mother] and [to] school." It found the remaining factors ((ii), (iv), (viii), and (x)) weighed in favor of awarding Mother custody:

- "Father has been stably employed by the United States government for multiple years" and "his career would afford [the] children with quality education and healthcare." However, "access to . . . care for ERED is somewhat limited in Serbia and could be subject to Father's current posting and language barriers." Mother's residence in Colorado, on the other hand, "provides highly assessable resources for ERED through the school and a wealth of direct family options for childcare when needed." Section 20-2-201(a)(ii).

- "Mother and Father have both accepted [the] responsibilities of parenting [and] demonstrated a

willingness to seek additional assistance for their children when needed." In particular, "Mother utilizes the substantial family ties available in Colorado as well as other childcare services when needed and Father takes advantage of the vast network of embassy resources to give the children the attention that they need." However, "[w]hether it's because there are additional resources available in Colorado or simply a difference in parenting philosophies, Mother pursues more resources and treatment for the speech therapy and other counseling services for ERED."[2] Section 20-2-201(a)(iv).

- "Mother and Father now live over 5,000 miles apart from one another [so] shared custody is not feasible." The children have a "substantial connection" to Colorado, with "a network of relatives, including cousins, aunts, uncles, and grandparents all within driving distance[.]" They are also "currently enrolled either in school or preschool [in Colorado] and receiving access [to] the resources that they need." In contrast, Father's current posting in Serbia "removes the children from any proximity to other family" and "his career involves changing posts every few years." "The combination of those two things provides less consistency and stability for the children." Mother has demonstrated a willingness to facilitate travel for the children from her custody to Father's. Section 20-2-201(a)(viii).

- "The most persuasive fact directing the [c]ourt's custody decision is Father's type of employment. Though Father certainly has an admirable and impressive work history, the very nature of his career appears to be less stable than the life offered with Mother. . . . The children would be living primarily in a [c]ountry near one of the most prominent conflicts in the world if Father were given primary custody.

---

[2] Father argues the district court's analysis of § 20-2-201(a)(iv) belongs under § 20-2-201(a)(ii). We decline to consider this argument because it is not supported with cogent argument or citation to pertinent authority. *Baer v. Baer*, 2022 WY 165, ¶ 38, 522 P.3d 628, 640 (Wyo. 2022) ("We do not consider issues unsupported by cogent argument or citation to pertinent authority." (citing *Hodson v. Sturgeon*, 2017 WY 150, ¶ 6, 406 P.3d 1264, 1265 (Wyo. 2017))). In any event, Father also argues "whether analyzed under factor (ii) or (iv)," the district court's finding that Mother pursues more resources and treatment for ERED is contrary to the evidence. Because Father's main argument is that the district court's analysis is not supported by the evidence, we review it as such.

. . . Additionally, and as stated above, [F]ather's employment could cause frequent relocation to places where the children will have little to no connection and far from family. . . . This unique consideration weighs in favor of giving Mother . . . custody[.]" Section 20-2-201(a)(x).

[¶27] Father argues the district court abused its discretion by awarding Mother primary custody of the children. He claims the court's concern about the effect his career would have on the children's stability and safety is contrary to the evidence which showed the parties intended to, and did, raise their children overseas knowing Father would be relocated every few years and that while in Serbia, the family was part of the U.S. Embassy community, lived in an affluent and very safe neighborhood, and had access to a private school. He also argues Mother obviously did not find Serbia to be unsafe as she did not hesitate to leave the children there with Father for long periods of time while she pursued her military career.

[¶28] Father maintains the court erred in finding Mother had accepted the responsibilities of parenting and was mentally fit to parent. He claims the evidence showed Mother was largely absent from the children's lives during the parties' marriage and when she was home, she relied on a full-time nanny and au pair to care for the children even though she was unemployed. He also asserts the evidence showed Mother had expressed suicidal thoughts, was diagnosed with postpartum depression after CAD's birth, and saw a psychologist for depression.

[¶29] Father faults the court for finding Mother pursues more resources, treatment, and counseling services for ERED than Father and that access to care for ERED is limited in Serbia and could be subject to Father's current posting and language barriers. According to Father, ERED was in speech therapy in Serbia before Mother moved to Colorado, out-of-school therapy recommendations for ERED had just recently been made, and there was no evidence suggesting any language barriers prevented ERED from accessing any care. He also claims that if the country to which he is assigned cannot provide ERED the resources he needs, the State Department will assign Father to a country which can.

[¶30] Father asserts the court's finding that ERED and CAD have a substantial connection to Colorado is not supported by the evidence which showed CAD had never lived in Colorado prior to the temporary custody order and ERED had not lived in Colorado since he was 18 months old. Father also says the evidence showed that although Mother has relatives who reside in Colorado, her uncle and grandfather have criminal issues and she was previously estranged from all her relatives except her grandmother.

[¶31] Finally, Father argues the court ignored the evidence demonstrating that ERED had extreme behavioral issues when in Mother's care, including self-harm and acting violently

11

toward other adults, but did not have the same issues with Father because of his stable parenting.

[¶32] Father's arguments are based on his version of the evidence, which is contrary to our standard of review. When evaluating the sufficiency of the evidence to support a district court's decision, "'[w]e consider the evidence in the light most favorable to the district court's decision, "affording every favorable inference to the prevailing party and omitting from our consideration the conflicting evidence."'" *Taulo-Millar v. Hognason*, 2022 WY 8, ¶ 15, 501 P.3d 1274, 1279 (Wyo. 2022) (quoting *Bishop v. Bishop*, 2017 WY 130, ¶ 9, 404 P.3d 1170, 1173 (Wyo. 2017), and *Durfee v. Durfee*, 2009 WY 7, ¶ 6, 199 P.3d 1087, 1089 (Wyo. 2009)) (other citation omitted). When the evidence is viewed in the light most favorable to the district court's decision and Father's conflicting evidence is ignored, there is ample evidence supporting the district court's decision that awarding custody to Mother was in the children's best interests.

[¶33] Father's employment as a foreign service officer requires him to move every 3-4 years to various locations around the world. In contrast, Mother is stably employed with the United States Department of Agriculture and building a home in Colorado, indicating her intent to remain there. It was reasonable for the district court to determine Mother could provide more stability to the children than Father. The fact that Father and Mother may have intended to, and did, raise the children overseas during their marriage is of no moment. The question before the district court was what custody arrangement was in the children's best interests when the parties were no longer married.

[¶34] At the time of trial, Father was assigned to the U.S. Embassy in Serbia. The district court found that if Father was awarded custody of the children, they would be living in a country near one of the most prominent conflicts in the word. The court did not identify the conflict, but we assume it was referring to the current war in Europe between Ukraine and Russia. While there was no evidence at trial that both Ukraine and Serbia are in Europe, it is a proper fact upon which to take judicial notice and Father does not contend otherwise. *See* W.R.E. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."). In contrast, Mother lives in Colorado, far from Europe. The fact that Mother left the children in Serbia with Father for long periods of time while the parties were married does not detract from the fact that Serbia is closer to the conflict in Europe than Colorado. Again, the district court was tasked with determining which party's present circumstances, including the location of his or her current residence, was in the children's best interests.

[¶35] Mother was away from the family for extended periods of time, including a year-long absence from November 2019 to November 2020. However, the reasons for her absences were her obligations with the military, which Father encouraged her to join, and

her inability to travel during the COVID-19 pandemic. While she was away, she contacted the children's nanny whenever she could and wrote letters to the children. With respect to Mother's mental health, Mother denied she was suicidal but conceded she was diagnosed with postpartum depression after CAD's birth. Father admitted Mother sought professional help. It was reasonable for the district court to find Mother was able to care for the children even if she had a mental health condition given her "willingness to cooperate with providers if need be."

[¶36] ERED has speech delays and was diagnosed as being on the autism spectrum. The evidence showed the school in Serbia did not have services for speech or autism and the services available outside of the school were not in the English language. In contrast, ERED was receiving 120 minutes of speech therapy per month at his school in Colorado and was meeting the benchmarks necessary for him to move to the next grade level.

[¶37] Mother's mother, stepfather, grandmother, and aunt and two of Father's uncles live in Colorado. CAD and ERED also have cousins their age who reside there. In Colorado, the children interact with family a minimum of three times per week. Other than Father, the children have no family who reside in Serbia.

[¶38] Finally, although Father testified that ERED had extreme behavioral issues when in Mother's care, one of the children's nannies testified that when ERED did have a "breakdown," Mother would calm him by having him take deep breaths and giving him "hugs and lots of love[.]" The nanny said Father did not know how to handle the situation when ERED had a breakdown. Mother testified the self-harming occurred when ERED was with Father, not her, and Father would punish ERED for "just having feelings."

[¶39] Given the above evidence, we cannot say it was unreasonable for the court to find it was in the children's best interests to award Mother primary custody.

### *Mother's Appeal—No. S-22-0264*

[¶40] The district court determined there were three main marital assets: (1) a home in Sheridan (Sheridan residence) with a fair market value of $250,000; (2) a 2018 Lincoln Navigator valued at $72,000 and located in Serbia; and (3) Father's retirement account which had appreciated approximately $72,000 during the marriage. It ordered Father to arrange for the appraisal and sale of the Sheridan residence and pay Mother $40,000 from the sale proceeds minus the $16,000 down payment Father made on the residence for a total equalization payment of $24,000. In arriving at this figure, the court "considered the fact that Mother supports the idea of Father keeping possession of the family car [(Lincoln Navigator)] back in Serbia [and] $40,000 represents roughly half of the value of the vehicle that she would be entitled to while still considering the personal investment in the [Sheridan residence] that [F]ather made." Father was entitled to keep the Lincoln Navigator and the remaining proceeds from the sale of the Sheridan residence. The court also awarded

13

Mother one-half of the amount Father's retirement account grew between the date of the marriage and their separation (approximately $36,000).

[¶41]   Mother argues the district court abused its discretion by awarding her only $60,000 of the $394,000 marital estate while Father received $334,000.  Specifically, she claims the unfairness results from the court awarding her only $40,000 for her equity in both the Sheridan residence and the Lincoln Navigator.  Mother claims this division results in her receiving $4,000 for her equity in the residence and $36,000 for her one-half equity in the vehicle.  According to her, the court then lowered her equity in the residence by the amount of Father's down payment on the home ($16,000), leaving her with a net equity in the home of -$12,000, which shocks the conscience.

[¶42]   We review the district court's division of marital property for abuse of discretion. *Conzelman v. Conzelman*, 2019 WY 123, ¶ 15, 453 P.3d 773, 778 (Wyo. 2019).  "We will not disturb a property division in a divorce case, except on clear grounds, as the trial court is usually in a better position than the appellate court to judge the parties' needs and the merits of their positions."  *Metz v. Metz*, 2003 WY 3, ¶ 6, 61 P.3d 383, 385 (Wyo. 2003) (citing *Paul v. Paul*, 616 P.2d 707, 712 (Wyo. 1980), and *Warren v. Warren*, 361 P.2d 525, 526 (Wyo. 1961)).  Nevertheless, we will find an abuse of discretion when "'the property disposition shocks the conscience of this [C]ourt and appears to be so unfair and inequitable that reasonable people cannot abide it.'"  *Innes v. Innes*, 2021 WY 137, ¶ 16, 500 P.3d 259, 262 (Wyo. 2021) (quoting *Malli v. Malli*, 2020 WY 42, ¶ 14, 460 P.3d 245, 249 (Wyo. 2020), and *Long v. Long*, 2018 WY 26, ¶ 22, 413 P.3d 117, 125 (Wyo. 2018)).

[¶43]   The disposition of marital property in a divorce is governed by Wyo. Stat. Ann. § 20-2-114(a) (LexisNexis 2021) which states:

> [I]n granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children.

There are no specific guidelines as to the weight the district court must afford the statutory considerations when making a property division."  *Malli*, ¶ 16, 460 P.3d at 249 (citations omitted).  "The district court may also properly consider the short duration of a marriage as one measure of how the marriage affected any increase in the value of property brought to the marriage by one party."  *Dane v. Dane*, 2016 WY 38, ¶ 31, 368 P.3d 914, 920 (Wyo. 2016) (citation omitted).  "Furthermore, in evaluating the position in which the parties will be left after the divorce, it is necessary to consider not only to whom property will be

awarded, but also who will be responsible for any debt relating to that property." *Id.* (citing *Williams v. Williams*, 2016 WY 21, ¶ 40, 368 P.3d 539, 551 (Wyo. 2016)).

[¶44] At the outset, we note the values Mother assigns to the marital assets ($394,000) and the amount awarded to Father ($334,000) are likely inflated because she fails to account for the mortgage on the Sheridan residence, the district court's order directing Father to have the property appraised, and the closing costs and realtor fees Father will probably incur when selling the residence.[3] Nevertheless, there is no question Father received the majority of the marital assets. Section 20-2-114(a), however, contemplates a distribution that is "just and equitable." It "'does not require an equal division'" of property, and we have said "'a just and equitable division is as likely as not to be unequal.'" *McMurry v. McMurry*, 2010 WY 163, ¶ 8, 245 P.3d 316, 319 (Wyo. 2010) (quoting *Warren v. Warren*, 361 P.2d 525, 526 (Wyo. 1961)) (other citations omitted). The equity of a district court's property division is evaluated "from the perspective of the overall distribution rather than from a narrow focus on the effects of any particular disposition[.]" *Innes*, ¶ 17, 500 P.3d at 262 (quoting *Stevens*, ¶ 11, 318 P.3d at 807). Given the evidence at trial, we cannot say the unequal division of property in this case was unjust or inequitable.

[¶45] The Sheridan residence and the Lincoln Navigator were purchased after the marriage. However, Father was in the process of purchasing the Sheridan residence before the marriage, including making a $16,000 down payment on the property prior to the marriage, and the deed and mortgage were in his name only. The parties lived in the Sheridan residence only briefly before moving overseas for Father's career. Once they moved, the parties rented the residence to third parties. Father used the rental income to provide for the family and used his VA benefits (which were earned prior to the marriage) to pay the mortgage, utilities, insurance, and taxes on the residence. Mother, on the other hand, made no economic contribution to the purchase and maintenance of the Sheridan residence other than working with the property management team to approve potential tenants.

[¶46] Similarly, Father used $34,000 he obtained from the sale of a pre-marital vehicle to purchase the Lincoln Navigator. There is no indication that Mother financially contributed to the purchase of the Lincoln Navigator. She did, however, sell another marital vehicle

---

[3] The district court acknowledged there was a mortgage on the Sheridan residence and the fact it was in Father's name only. Mother admits there was a mortgage but claims the district court did not consider it when dividing the marital property because it stated there were no "marital debts to be resolved in [the divorce] [d]ecree." The court did not state there were no marital debts to be resolved, but rather: "*The parties did not present evidence* regarding any marital debts to be resolved in [the divorce] [d]ecree." (Emphasis added). While there was no evidence as to the amount of the mortgage other than Mother's attorney's comment in opening statement and an attachment to Mother's pretrial memorandum, both of which indicated the mortgage debt was $140,000, the district court was obviously aware that Father's share of the proceeds from the sale of the Sheridan residence would be reduced by the amount of the mortgage.

for $10,000 prior to moving to Colorado after the parties' separation; Mother kept the sale proceeds. Mother also agreed Father should be awarded the Lincoln Navigator in the divorce. She testified she was requesting "50 percent of the equity in the Sheridan residence or to have the home in full if [Father] would like to keep his vehicle. Because I do think it's important when the children go visit him that he has a vehicle and it is – it's his vehicle. He can have it."

[¶47] Section 20-2-114(a) allows the district court to consider which party acquired the property when determining a just and equitable division of the marital property. "[I]t may be appropriate to return the property to the contributing party under the circumstances of a particular case[.]" *Johnson*, ¶ 29, 458 P.3d at 37. Given that the Sheridan residence and the Lincoln Navigator were primarily acquired and maintained with Father's pre-marital funds, it was reasonable for the district court to award Mother only $24,000 for her equity in both.

[¶48] Mother faults the court for failing to discuss or make any findings concerning "the condition in which [the parties] will be left by the divorce" as required by § 20-2-114(a). She claims that because she earns less than half of what Father earns, she should have received a larger portion of the marital property yet Father received a windfall by being awarded 85% of the marital assets while she received a mere 15%. According to Mother, such 85/15 split shocks the conscience and cannot fit within any definition of equitable.

[¶49] In making its division of the marital property, the district court stated it was making a just and equitable distribution based on what the parties requested during the trial, the respective merits of the parties, the condition in which they will be left by the divorce, and who acquired the property. While Mother complains about the lack of findings with respect to the third factor, neither party requested special findings of fact and conclusions of law pursuant to W.R.C.P. 52(a)(1)(A). "When no such request is made, 'it shall not be necessary for the court to state its findings, except generally for the plaintiff or defendant.'" *Begley v. Begley*, 2020 WY 77, ¶ 25, 466 P.3d 276, 284 (Wyo. 2020) (quoting Rule 52(a)(1)) (other citations omitted).

[¶50] In any event, the record clearly shows Mother is in a substantially better financial condition after the divorce than she was in prior to the marriage. Before meeting Father, Mother lived in an apartment and was in debt. Father helped her pay off her debts during the marriage. She enlisted in the Colorado Army National Guard during the marriage and is currently in the reserves. At the time of trial, she was earning over $49,000 a year working for the United States Department of Agriculture and in the process of building a four bedroom, three bathroom house with a fenced backyard on a quarter acre lot in a good neighborhood. She received a total payment of $60,000 in the court's property division despite making little to no economic or property contribution during the parties' five-year marriage. Under these circumstances, we cannot say the court's division of the marital property was unreasonable. It certainly does not shock the conscience.

## CONCLUSION

[¶51]   Because Mother's failure to designate Dr. Calhoon as an expert witness under Rule 26(a)(2)(A) was harmless, the district court did not abuse its discretion at trial by admitting Dr. Calhoon's expert opinion testimony and report.  The district court did not abuse its discretion by granting Mother primary custody of the children or in its division of the marital property.

[¶52]   We affirm.